# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**JASON PATRICK SWAN**                           **CIVIL ACTION**

**VERSUS**                                       **NO. 15-60-JWD-EWD**

**CAROLYN W. COLVIN, ACTING**
**COMMISSIONER OF SOCIAL SECURITY**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on August 30, 2016.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**JASON PATRICK SWAN**                           **CIVIL ACTION**

**VERSUS**                                       **NO. 15-60-JWD-EWD**

**CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Jason Patrick Swan ("Plaintiff") brought this action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, acting Commissioner of Social Security (the "Commissioner"), denying his application for Title II disability insurance.

Based on the applicable standard of review under § 405(g) and the analysis that follows, it is the recommendation of this Court that the Commissioner's decision be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**.

## I.  Procedural Background[1]

On February 8, 2010, Plaintiff filed a prior Title II application for disability insurance benefits and a Title XVI application for supplemental security income ("SSI"), alleging disability beginning July 7, 2009, based on schizophrenia and obesity ("Prior Application").[2]  On November 19, 2010, an Administrative Law Judge ("ALJ"), found Plaintiff was not disabled and denied the Prior Application.[3]  No appeal from that decision was taken.[4]

---

[1] References to documents filed in this case are designated by "R. Doc. at [page numbers]."  References to the record of administrative proceedings filed in this case are designated by "AR [page numbers]."

[2] AR, p. 51.

[3] AR, pp. 48-59.  In the November 19, 2010, decision denying benefits under Plaintiff's Prior Application, the ALJ determined that Plaintiff's schizophrenia and obesity were not "severe impairments."  AR, p. 54.

[4] AR, p. 11.

On January 8, 2013, Plaintiff filed a second Title II application seeking disability insurance benefits and a second Title XVI application seeking SSI.[5]  Therein, Plaintiff alleged that as of July 15, 2009,[6] he was disabled and unable to work because of paranoid schizophrenia and hearing loss in the right ear.[7]  The claim was initially denied[8] and Plaintiff filed a request for a hearing, which was held on December 3, 2013.[9]  Plaintiff, represented by counsel, appeared and testified at the hearing.[10]  A vocational expert, Thomas G. Mungall, III, also appeared and testified.[11]

On February 7, 2014, the ALJ denied Plaintiff's application for disability insurance benefits and SSI.[12]  The ALJ concluded that Plaintiff had not been under a disability from the alleged onset date of March 10, 2010, through February 7, 2014, the date of the decision.[13]  The ALJ found Plaintiff's paranoid schizophrenia is a severe impairment, but it does not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[14]  The ALJ found Plaintiff's ear condition is not a severe impairment because it is only a slight abnormality having a minimal effect on Plaintiff and would not be expected to interfere with his ability to work.[15]  The ALJ also found that Plaintiff has the residual functional capacity ("RFC"), to perform a full range of work at all exertional levels, but with the

---

[5] AR, pp. 126, 133.
[6] Plaintiff subsequently amended his alleged onset date to January 9, 2010 (AR, p. 245), and amended it a second time to March 10, 2010 (AR, p. 249).
[7] R. Doc. 17 at 1-2; AR, pp. 126, 245.
[8] AR, pp. 60-61.
[9] AR, pp. 29-47.  On November 11, 2013, prior to a hearing, Plaintiff filed a written request to reopen his Prior Application.  (AR, p. 244).  There is no information in the record regarding the outcome of Plaintiff's request, but it has not been raised as an issue in this appeal.
[10] AR, pp. 31-42.
[11] AR, pp. 43-47.
[12] AR, pp. 8-22.
[13] AR, p. 12.
[14] Id.
[15] AR, p. 14.

nonexertional limitation of being limited to work of a simple, routine nature with no public interaction.[16]

On February 19, 2014, Plaintiff appealed the ALJ's February 7, 2014, decision.[17]  On December 12, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.[18]  Accordingly, Plaintiff exhausted his administrative remedies with regard to his application before filing this action for judicial review and the ALJ's decision is the Commissioner's final decision for purposes of judicial review.  *See* 20 C.F.R. § 404.981.

## II.  Standard of Review

This Court's review of the Commissioner's decision denying disability benefits is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001).  If the Commissioner fails to apply the correct legal standards, or provide a reviewing court with a sufficient basis to determine that the correct legal principles were followed, it is grounds for reversal.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981); *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981).

If substantial evidence supports the Commissioner's findings, they are conclusive and must be affirmed.  *Richardson*, 402 U.S. at 390, 91 S.Ct. at 1422; *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bradley*, 809 F.2d at 1057 (quoting *Deters v. Secretary of Health, Educ. & Welfare*, 789 F.2d 1181,

---

[16] AR, pp. 15-16.
[17] AR, p. 7.
[18] AR, pp. 1-6.

1185 (5th Cir. 1986)).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).  Conflicts in the evidence are for the Commissioner to decide, and if substantial evidence is found to support the decision, the decision must be affirmed even if there is evidence on the other side.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990). In applying the substantial evidence standard the court must review the entire record as a whole, but may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner, even if the evidence weighs against the Commissioner's decision.  *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### III. The ALJ's Disability Determination

A social security disability claimant has the burden of proving that he or she suffers from a disability, which is defined as a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity.  20 C.F.R. §§ 404.1505, 416.905.  In determining disability, the Commissioner, through the ALJ, works through a five-step sequential evaluation process.  *See* 20 C.F.R. § 404.1520(a)(4).  Using the five-step evaluation process, the Commissioner must determine whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a severe impairment(s); (3) the impairment(s) meets or equals the severity of a listed impairment in Appendix 1 of the regulations; (4) the impairment(s) prevents the claimant from performing past relevant work; and (5) the impairment(s) prevents the claimant from doing any other work.  *Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

The burden rests upon the claimant throughout the first four steps of this five-step process to prove disability.  If the claimant is successful in sustaining his burden at each of the first four levels then the burden shifts to the Commissioner at step five.  At step five, the Commissioner must prove, considering the claimant's residual functional capacity, age, education, and past work experience, that he or she is capable of performing other work.  20 C.F.R. § 404.1520(g)(1).  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove that he or she cannot, in fact, perform that work.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).

Here, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013 and that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 10, 2010.[19]  At the second step, the ALJ found that Plaintiff's paranoid schizophrenia is a severe impairment, but his ear condition is not.[20]  At the third step, the ALJ concluded that Plaintiff's impairments "do not singly or in combination meet or medically equal the required criteria for any of the impairments listed under section 12.01, Category of Impairments Mental, including listing 12.03,[21] and impairments listed under section 1.02, Special Senses and Speech,[22] or any other listed impairment.[23]  The ALJ found that the severity of Plaintiff's mental impairment did not meet or medically equal the criteria of Listing 12.03 because

---

[19] AR, p. 13.

[20] AR, pp. 13-14.

[21] Listing 12.03 covers "Schizophrenic, Paranoid and Other Psychotic Disorders."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

[22] The Court notes that Listing 1.02 covers "Major dysfunction of a joint(s) (due to any cause)."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  Listing 2.0 covers "Special Senses and Speech."  *Id*.

[23] AR, p. 14.  Listed impairments are descriptions of various physical and mental illnesses and abnormalities generally characterized by the body system they affect.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results.  For a claimant to show that his impairment matches a listed impairment he must demonstrate that it meets all of the medical criteria specified in the Listing.  An impairment that exhibits only some of the criteria, no matter how severely, does not qualify.  *Sullivan v. Zebley*, 493 U.S. 521, 529-32, 110 S.Ct. 885, 891-92, 107 L.Ed.2d 967 (1990); 20 C.F.R. §§ 404.1525, 416.925.  In his appeal, Plaintiff has not asserted any error at step three.

the impairment did not satisfy the "paragraph B" or "paragraph C" criteria set forth in Listing 12.03.[24]

The ALJ then evaluated Plaintiff's residual functional capacity ("RFC"), to determine whether, despite his severe impairment, Plaintiff was able to do any of his past relevant work or other work in the national economy.[25]  The ALJ concluded that Plaintiff has the RFC to perform a full range of work at all exertional levels, but with the nonexertional limitation of being limited to work of a simple, routine nature with no public interaction.[26]  An impartial vocational expert testified that Plaintiff is not able to return to his past relevant work as a correction officer, security guard, fast food worker, and car hop.[27]  Relying upon the vocational expert's testimony, the ALJ concluded that Plaintiff is unable to perform any past relevant work.[28]

Proceeding to the fifth step, the ALJ found that based on the testimony of the vocational expert, as well as Plaintiff's age, education, work experience, and RFC, Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.[29]  The vocational expert testified that someone with Plaintiff's age, education, work experience, and RFC would be able to work as a dishwasher, commercial cleaner, and grounds keeper helper, and that each occupation had a large number of jobs available in both the local and national economy.[30]  Thus, the ALJ concluded that Plaintiff was not disabled.

---

[24] AR, p. 14.
[25] Residual functional capacity is a measure of a claimant's capacity to do physical and mental work activities on a regular and sustained basis.  It is the foundation of the findings at steps four and five.  20 C.F.R. §§ 404.1545, 416.945.
[26] AR, pp. 15-20.
[27] AR, p. 20.
[28] *Id.*
[29] AR, p. 21.
[30] *Id.*

## IV. Plaintiff's Allegations of Error

Plaintiff alleges that the ALJ committed the following errors that require reversal of the ALJ's decision: (1) the ALJ erred in failing to find his ear condition is severe, which error was harmful and tainted the ALJ's entire assessment; (2) the ALJ erred in her analysis of the medical evidence; (3) the ALJ's RFC determination fails to accurately reflect all of Plaintiff's limitations; (4) the ALJ erred in relying upon vocational expert testimony to find a significant number of jobs available; and (5) the ALJ erred in determining Plaintiff lacked credibility.

## V. Analysis

### A. The ALJ's step two finding regarding Plaintiff's ear condition is not supported by substantial evidence.

Plaintiff argues the ALJ's determination that his ear condition is not severe is not supported by substantial evidence. Plaintiff asserts that the ALJ expressly relied on a non-existent medical opinion from William Berzman, Ph.D., a non-existent treatment note from December 2013, and an Audiological Evaluation from September 2010 that is contradicted by more recent Audiological Evaluations.[31] Plaintiff also claims the ALJ failed to consider that his ongoing treatment, which required daily drops and ear washes, would have rendered full time work impossible.[32] The Commissioner responds that the ALJ properly assessed Plaintiff's ear impairment, since Plaintiff did not mention problems with his ear during the administrative hearing and the Audiological Evaluations from 2010 through August 2013 shows Plaintiff had 100% word recognition with both ears.[33]

At step two of the sequential evaluation process the Commissioner must determine whether the claimant's "impairment or combination of impairments" is severe. According to the

---

[31] R. Doc. 17 at 3-7.
[32] *Id*. at 7-8.
[33] R. Doc. 19 at 4-6 (*citing* AR, pp. 29-47, 427, 543, 553, 559, 567, 582, 584, 590).

regulations, if the claimant does "not have any impairment or combination of impairments which significantly limits" his or her "physical or mental ability to do basic work activities," the Commissioner "will find" the claimant does "not have a severe impairment and [is], therefore, not disabled." 20 C.F.R. §§ 404.1520(c), 416.920(c).  Basic work activities include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.921(b)(1)-(6).

Despite the Regulation's more stringent language, the Fifth Circuit and others have clarified that, "An impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985); *see also Anthony v. Sullivan*, 954 F.2d 289, 293 n.5 (5th Cir. 1992) (step two only requires a "*de minimis* showing"); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("the severity requirement may still be employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint").  Further, "[B]ecause step two is to be rarely utilized as basis for the denial of benefits, its invocation is certain to raise a judicial eyebrow." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 361 (3d Cir. 2004) (*citing* SSR 85–28, 1995 WL 56856, at *4 (Jan. 1, 1985) ("Great care should be exercised in applying the not severe impairment concept.")).

"The severity determination is based solely on medical factors." *Fleetwood v. Barnhart*, 211 F. App'x 736, 739 (10th Cir. 2007).  The claimant's "age, education, and work experience"

cannot be considered.   20 C.F.R. §§ 404.1520(c), 416.920(c).   Here, the ALJ determined that Plaintiff's ear condition is not severe based on the State agency disability determination explanation assessment and "the most recent medical evidence from February and December 2013," which showed that Plaintiff's condition had improved with treatment.[34]   Pointing to an Audiological Evaluation from September 2010, the ALJ found that Plaintiff has a history of moderate severe to mild hearing loss with conductive component in the right ear.[35]   The ALJ found that Plaintiff had an ENT evaluation on October 28, 2010 due to complaints of drainage from the right ear,[36] was diagnosed with chronic otitis media with purulent effusion, and referred to Dr. Chaille Daniel for surgery.[37]   According to the ALJ, Plaintiff underwent surgery on his right ear in July 2011 and again in January 2013.   At the time of the ALJ's February 7, 2014 decision, the ALJ found Plaintiff was "status-post revision with significant regrowth and scarring of the mastoid; exteriorized area.   [Plaintiff] was assessed with healing after canal wall down."[38]   The ALJ further found that Plaintiff reported he felt good in a December 2013 treatment note and there were no further problems associated with Plaintiff's ear or any functional limitations that would result in more than a minimal effect on Plaintiff's ability to work.[39]

First, the ALJ relied upon a non-existent treatment note from December 2013 to support her step two analysis of Plaintiff's ear condition.[40]   The ALJ asserts that "the most recent evidence

---

[34] AR, p. 14 (*citing* AR, pp. 75, 488, 494).  Although the ALJ refers to "medical evidence from February and December 2013," the ALJ cites treatment notes from January and February 2013.  (*See* AR, pp. 488, 494).

[35] AR, p. 14 (*citing* AR, p. 435).

[36] AR, p. 14 (*citing* AR, p. 266).  The medical record cited by the ALJ shows that Dr. Boone conducted an ENT evaluation of Plaintiff on October 21, 2010.  (AR, p. 266).

[37] AR, p. 14 (*citing* AR, pp. 395, 444).  The medical records cited by the ALJ show that on July 28, 2010, Dr. Daniel referred Plaintiff to Dr. Surek for evaluation and treatment for chronic otitis.  (AR, p. 444).  Additional medical records show that Dr. Daniel treated Plaintiff for an earache on October 11, 2010 and referred Plaintiff to Dr. Boone for an ENT evaluation of his chronic otitis.  (AR, pp. 340-42).  The medical records also show that as of December 22, 2010, Dr. Moises Arriaga was scheduled to perform Plaintiff's surgery on January 17, 2011.  (AR, p. 337).

[38] AR, p. 14 (*citing* AR, p. 488).

[39] AR, p. 14 (*citing* AR, p. 494).  The treatment note cited by the ALJ is actually from January 2, 2013.  (AR, p. 494).

[40] AR, p. 14.

of record in February and December 2013, reported [Plaintiff] had made progress while in treatment."[41]  The Court has reviewed the record and there are no treatment notes from December 2013.  This is because the ALJ actually relies on treatment notes from January and February 2013.[42]  Further, the records do not show that Plaintiff's ear condition had improved with treatment.  Although the ALJ relies on the January 2, 2013 treatment note in which Plaintiff reported that he "feels good,"[43] the ALJ ignores Dr. Moises Arriaga's findings in the January 2, 2013 treatment note that Plaintiff, "has developed a scar band with a pseudo-encapsulated area of the cavity.  On CT we are suspicious that there may be some actual recurrence of the cholesteatoma on the promontory.  He has a radicular cavity but has developed extensive scar tissue *closing up the ear*."[44]  Moreover, the ALJ completely ignores the fact that the January 2, 2013 treatment note specifically mentions that Plaintiff was scheduled to have right revision tympanomastoidectomy surgery on January 22, 2013, demonstrating that Plaintiff's condition had not improved with treatment at that time.[45]

The Court also finds that the February 13, 2013 treatment note does not support the ALJ's conclusion that Plaintiff's ear condition improved with treatment.  According to the ALJ, the February 13, 2013 treatment note shows Plaintiff was "status-post revision with significant regrowth and scarring of the mastoid; exteriorized area.  [Plaintiff] was assessed with healing after canal wall down."[46]  Without any further explanation, the ALJ implies that these statements show Plaintiff's ear condition had improved.  However, in the February 13, 2013 treatment note, which was a follow-up visit after Plaintiff's January 29, 2013 surgery, Dr. Arriaga found that Plaintiff,

---

[41] *Id.*
[42] *Id.* (*citing* AR, p. 488-495).
[43] AR, p. 494.
[44] AR, p. 492 (emphasis added).
[45] AR, pp. 492, 494.
[46] AR, p. 14 (*citing* AR, p. 488).

"had significant regrowth and scarring of the mastoid. . . .  We cleared those out as best we could, but I am still suspicious that [some pneumatized cells inferior to the cochlea] may continue to give us some drainage issues."[47]  Dr. Arriaga further noted, "Healing after canal wall down.  I spent a significant amount of time cleaning the cavity today with cotton tipped applicators to avoid suctioning and dizziness.  We will have him use half vinegar alcohol washes, followed by the hair dryer."[48]  Although Plaintiff's ear may have been "healing" after the January 22, 2013 surgery, there is no indication in the February 13, 2013 treatment note that Plaintiff's ear condition had improved with treatment.

While the ALJ claims that the January and February 2013 treatment notes are "the most recent evidence of record," the administrative record shows otherwise.  The ALJ fails to mention Dr. Arriaga's treatment notes from her follow-up visits with Plaintiff in March, May, August, and November 2013, which show that Plaintiff's ear condition had not improved prior to the December 2013 administrative hearing.[49]  On March 20, 2013, Dr. Arriaga found that, "The cavity actually looks improved from his previous visits, but he still has drainage . . . ."[50]  Although Dr. Arriaga noted that Plaintiff's ear was "doing better" during a follow-up visit on May 1, 2013,[51] Plaintiff's ear began draining again prior to the August 7, 2013 follow-up visit with Dr. Arriaga.[52]   The treatment note from August 7, 2013 provides that Dr. Arriaga was "actually surprised despite an attempt to create a radical cavity, his body has regrown a new eardrum on that side" and noted that, "We were able to clean a pseudomembrane blocking part of the cavity posteriorly."[53]

---

[47] AR, p. 488.
[48] Id.
[49] AR, pp. 540-52.
[50] AR, p. 549.
[51] AR, p. 545.
[52] AR, p. 540.
[53] Id.

The November 6, 2013 treatment note further demonstrates that Plaintiff's ear condition had not improved with treatment, as Dr. Arriaga found "dried things" in the right ear and, "The cavity itself looks good, but behind the drum, recall that he has developed a neodrum and he has now had some bulging areas in that location.  There was some superficial moisture that required cleaning and we had to carefully clean right on this bulging area."[54]  Dr. Arriaga further found that Plaintiff's condition "represents some recurrent cholesteatoma behind an intact drum.  It is not draining" and that Plaintiff "may need some revision surgery down the road."[55]  Dr. Arriaga noted that, "If we do need revision surgery, I am hopeful that all we would need to do is essentially excise that drum and debride what is behind that drum to exteriorize this again as his body has decided to try to close this up despite our efforts to keep the ear open."[56]  The fact that Dr. Arriaga mentioned the possibility of a fourth ear surgery[57] in the future shows that Plaintiff's ear condition remained problematic despite ongoing treatment.

The ALJ also supports her determination regarding the severity of Plaintiff's ear condition by relying upon an Audiological Evaluation from September 13, 2010, which shows that Plaintiff has a history of "moderate severe to mild hearing loss with conductive component in the right ear."[58]  The administrative record, however, contains several Audiological Evaluations that show Plaintiff had "moderate to moderate-severe" chronic hearing loss when he was tested in 2010, 2011, and 2012, but Plaintiff had "moderately severe to severe" chronic hearing loss when he was tested more recently in January and March 2013.[59]  The most recent Audiological Evaluation from

---

[54] AR, p. 535.
[55] *Id.*
[56] *Id.*
[57] As previously discussed, Plaintiff has already undergone three surgeries on the right ear, which took place on January 17, 2011 (AR, p. 406, 578-81), July 19, 2011 (AR, pp. 574-77), and January 29, 2013 (AR, pp. 461-64).
[58] AR, p. 14 (*citing* AR, p. 435).
[59] AR, pp. 435, 553, 559, 567, 582, 584, 590.

August 7, 2013 shows Plaintiff had "severe" chronic hearing loss in the right ear.[60]  Relying heavily

upon the Audiological Evaluations, the Commissioner asserts the ALJ properly found that

Plaintiff's ear condition did not constitute a severe impairment because Plaintiff has full hearing

in his left ear, experiences no difficulties in communication as a result of diminished hearing in

the right ear, and Plaintiff retains 100% word recognition with both ears.[61]  The ALJ, however,

does not mention the additional Audiological Evaluations or Plaintiff's communication skills in

her determination regarding the severity of Plaintiff's ear condition.[62]  Despite the Commissioner's

assertion, the Court "may not accept appellate counsel's post hoc rationalizations for agency

action."  *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69, 83 S.Ct. 239, 246, 9

L.Ed.2d 207 (1962).  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's

decision, as adopted by the Appeals Council."  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

The only way the ALJ could reach the conclusion that Plaintiff's ear condition is not severe

was by picking and choosing isolated positive comments from the record and ignoring the

overwhelming weight of the evidence in the record.  *See Trahan ex rel. T.T. v. Astrue*, 2013 WL

4813917, at *9 (W.D. La. Sept. 9, 2013); *See also Loza v. Apfel*, 219 F.3d 278, 393 (5th Cir. 2000).

As mentioned above, the ALJ found that Plaintiff's ear condition had improved with treatment

based on Plaintiff's comment in a January 2, 2013 treatment note that he "feels good."[63]  The ALJ,

however, ignored that Plaintiff was scheduled to have ear surgery at the end of January 2013 and

that Dr. Arriaga found that Plaintiff "has a radicular cavity but has developed extensive scar tissue

closing up the ear."[64]  The ALJ similarly relied on an Audiological Evaluation from September 13,

---

[60] AR, p. 543.
[61] R. Doc. 19 at 4-6 (*citing* AR, pp. 29-47, 427, 543, 553, 559, 567, 582, 584, 590).
[62] AR, p. 14.
[63] AR, p. 494.
[64] AR, p. 492.

2010 showing that Plaintiff had "moderate severe to mild" hearing loss,[65] even though more recent Audiological Evaluations show that Plaintiff's hearing loss had progressed to "moderate to moderate-severe" in 2012, to "moderately severe to severe" in January and March 2013, and finally to "severe" in August 2013.[66]  These are just two examples of the ALJ picking and choosing the evidence that supports a finding of non-severity while omitting from consideration any contrary evidence.  *See Trahan*, 2013 WL 4813917, at *9.  However, the Fifth Circuit has held, "[I]t is clear that the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Loza v. Apfel*, 219 F.3d 278, 393 (5th Cir. 2000) (citing cases).

The Court finds the ALJ's decision at step two is not supported by substantial evidence because the ALJ ignores a substantial amount of record evidence probative to Plaintiff and incorrectly summarizes much of the evidence actually mentioned in the decision.  The ALJ claims that her determination regarding the severity of Plaintiff's ear condition is supported by the State agency Disability Determination Explanation assessment completed by Dr. William Berzman.[67]  Dr. Berzman, however, is a mental specialist who performed a disability assessment regarding Plaintiff's mental condition, not his ear condition.[68]  Although the ALJ referred to the assessment completed by Dr. Berzman, the Disability Determination Explanation also contains a disability assessment of Plaintiff's ear condition by Dr. Joseph Michalik, who concluded that, "All factors considered the impairment causes no more than minimal functional limitations and does not significantly limit the performance of basic work related activities."[69]  Thus, the Court assumes

---

[65] AR, p. 435.
[66] AR, pp. 543, 553, 559, 567, 582, 584, 590.
[67] AR, p. 14.
[68] AR, p. 14 (*citing* AR, p. 75).
[69] AR, pp. 74-75.

that the ALJ meant to refer to Dr. Michalik's assessment to support her conclusion that Plaintiff's ear condition is not severe.

Although the report by Dr. Michalik may provide some evidence to support the ALJ's decision at step two, considering the record evidence as a whole and the *de minimus* burden on the Plaintiff at step two, the Court finds the ALJ erred in finding Plaintiff's ear condition is not severe.

**B. The ALJ's error at step two in failing to find Plaintiff's ear condition severe is harmless because Plaintiff's substantial rights were not affected at step three of the analysis.**

An error at step two may be considered harmless if it does not "affect the substantial rights of a party" or when it "is inconceivable that the ALJ would have reached a different conclusion" absent the error. *See Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012); *Frank v. Barnhard*, 326 F.3d 618, 622 (5th Cir. 2003). Here, after finding Plaintiff's mental condition was severe and Plaintiff's ear condition was not severe, the ALJ proceeded to the remaining steps of the analysis and found Plaintiff not disabled. At step three, the ALJ concluded that Plaintiff's impairments "do not singly or in combination meet or medically equal the required criteria for any of the impairments listed under section 12.01, Category of Impairments Mental, including Listing 12.03, and impairments listed under section 1.02, Special Senses and Speech, or any other listed impairment."[70] While the ALJ goes into detail to explain why Plaintiff's mental impairment does not meet or medically equal the criteria of Listing 12.03, the ALJ provides no analysis of Plaintiff's ear condition beyond her general conclusion that, "The signs, symptoms, and history of treatment presented in the evidence of record are inconsistent with any impairments of listing-level

---

[70] AR, p. 14. As previously noted, Listing 1.02 covers "Major dysfunction of a joint(s) (due to any cause)" and Listing 2.0 covers "Special Senses and Speech." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

severity."[71]   "Such a bare conclusion is beyond meaningful judicial review."  *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

"By statute, the ALJ is required to discuss the evidence offered in support of a claimant's application and to explain why he or she finds the claimant not to be disabled at each step." *Milligan v. Colvin*, 2014 WL 7028038, at *4 (N.D. Tex. Dec. 12, 2014); *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); 42 U.S.C. § 405(b)(1).  Although the ALJ is not required to do an exhaustive point-by-point discussion, in the instant case, the ALJ offered nothing to support her conclusion at step three with respect to Plaintiff's ear condition.  As such, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."  *Audler*, 501 F.3d at 448 (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).  However, the ALJ's failure to explain her step three findings does not require remand unless the claimant's substantial rights were affected.  *Forest v. Astrue*, 2012 WL 3137844, at *10 (E.D. La. Aug. 1, 2012).  "A claimant's substantial rights are affected at Step 3 when he demonstrates that he meets, or at least appears to meet, the requirements for a Listing."  *Id.* (quoting *Reynolds v. Astrue*, 2010 WL 583918, at *6 (N.D. Miss. Feb. 16, 2010)).

In the instant case, Plaintiff does not argue that his ear condition meets the requirements for a particular Listing.  Plaintiff also does not identify any specific evidence in the record or otherwise demonstrate that his ear condition meets the requirements of any Listing.  Because Plaintiff does not argue or point to evidence showing that his ear condition meets the criteria of a specific Listing, Plaintiff has failed to satisfy his step three burden and the ALJ's finding is supported by substantial evidence.  *See Sulik v. Astrue*, 2013 WL 5350692, at *3 (M.D. La. Sept. 23, 2013).  *See, e.g., White v. Astrue,* 2012 WL 4866510, at *12 (N.D. Tex. Sept. 6, 2012)

---

[71] AR, p. 14.

(substantial evidence supported the ALJ's decision because the claimant failed to argue or provide evidence that he met specific sections of the Listings); *Garrett v. Astrue,* 2011 WL 6938463, at *8 (N.D. Tex. Oct. 18, 2011) (same); *Lloyd v. Astrue,* 2011 WL 7049451, at *3 (W.D. La. Dec. 7, 2011) (ALJ's decision was supported by substantial evidence where "plaintiff has not identified any listing that he purports to meet or equal, nor has he demonstrated that he meets or equals all of the criteria of any given listing"), *aff'd*, 484 Fed. App'x 994 (5th Cir. 2012), *cert. denied*, ——U.S.——, 133 S.Ct. 1470 (2013); *White v. Astrue,* 2009 WL 4823843, at *2 (M.D. La. Dec. 10, 2009) ("plaintiff does not provide the Court with any analysis of the relevant regulations or evidence to support his contention that his impairments meet or medically equal a listed impairment.  Further, plaintiff fails to suggest or inform the Court as to the listing or listings his impairments meet.  Therefore, the Court finds that plaintiff has failed in his burden at step three").

The Court finds that the ALJ's failure to provide reasons for her step three finding was harmless because Plaintiff has not met his burden of establishing that his ear condition satisfies the specified criteria of any identified Listing.  *See Sulik v. Astrue*, 2013 WL 5350692, at *4 (M.D. La. Sept. 23, 2013); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) ("We reject out of hand Vandenboom's conclusory assertion that the ALJ failed to consider whether he met listings 12.02 or 12.05C because Vandenboom provides no analysis of the relevant law or facts regarding these listings."); *Smith v. Astrue*, 914 F. Supp. 2d 764, 784–85 (E.D. La. 2012) ("Although it would have been preferable for the ALJ to have discussed the evidence that she considered immediately following her step-three finding," remand is not warranted because "plaintiff has not proven that her substantial rights have been affected and any error on the part of the ALJ at step three of the § 416.920 analysis was harmless.").

**C.  The ALJ's error at step two is also harmless because Plaintiff's substantial rights were not affected at step four of the analysis.**

While Plaintiff does not argue that the ALJ's determination that his ear condition is not severe resulted in an error in the ALJ's step three analysis, Plaintiff argues the error was not harmless because it resulted in an error in the ALJ's RFC determination at step four of the analysis. At step four, the ALJ found Plaintiff has the RFC to perform a full range of work at all exertional levels, except that Plaintiff is limited to work of a simple, routine nature with no public interaction.[72]  Plaintiff asserts that the ALJ erred by limiting her analysis of the RFC determination to the effects of Plaintiff's schizophrenia, excluding consideration of the limiting effects of Plaintiff's ear condition on his ability to maintain gainful employment.[73]  According to Plaintiff, "had [the ALJ] considered the additional limitations upon [Plaintiff's] ability to focus, concentration [sic], persist, pay attention, and interact appropriately with supervisors and coworkers resulting from the distractions of ear drainage, odor, pain, dizziness, and interruptions for treatment, a more limited RFC could have resulted, altering the disposition of Plaintiff's claim."[74]

The Court finds that the ALJ did not err by failing to include any limitations in the RFC determination specifically related to Plaintiff's ear condition.  In addressing the impact of Plaintiff's ear condition on his RFC, the ALJ found that although Plaintiff has a history of right ear problems and is status-post surgery, Plaintiff's statements regarding the severity of his ear condition and the degree of his limitations were not fully credible.[75]  The ALJ further found that, "At the hearing, the claimant was able to hear and understand normal conversation, he made no

---

[72] AR, pp. 15-20.
[73] R. Doc. 17 at 17-20.
[74] *Id*. at 8.
[75] AR, p. 19.

mention of a hearing problem, and medical records post-surgery indicates [sic] he is doing well."[76] The ALJ cites Dr. Arriaga's January 2, 2013 treatment note in which Plaintiff reported that although "the [ear] drops make him dizzy," he "feels good otherwise."[77]

As the Commissioner points out, "While exclusive reliance upon demeanor in credibility determinations is inappropriate, it is not reversible error for an ALJ to consider demeanor as one of several factors in evaluating a claimant's credibility." *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (citing *Lovelace v. Bowen*, 813 F.2d 55, 59-60 (5th Cir. 1987)). "A factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence." *Villa*, 895 F.2d at 1024 (citing *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988)). The Court has reviewed the record and finds that the ALJ's credibility determination regarding Plaintiff's ear condition is supported by substantial evidence. As the ALJ points out, Plaintiff did not mention his ear condition at the December 3, 2013 administrative hearing. When the ALJ asked Plaintiff, "So tell me what's wrong with you?" Plaintiff responded, "I have schizophrenia."[78] In his closing statement, Plaintiff's counsel similarly stated, "Based on [Dr. Morrison's report] and the medical, we are arguing that [Plaintiff] meets 12.03A with 1, 3 and 4 and marked impairment in social functioning and activities of daily living."[79]

The ALJ's credibility determination is also supported by the medical evidence of record. The medical records from January and February 2013, cited in the ALJ's decision, show that Plaintiff suffered from persistent drainage problems, but do not show that Plaintiff suffered any problems associated with hearing loss.[80] Similarly, Dr. Joseph Michalik performed an assessment

---

[76] *Id.*
[77] *Id.* (*citing* AR, p. 494).
[78] AR, p. 33.
[79] AR, pp. 46-47. Listing 12.03 covers "Schizophrenic, Paranoid and Other Psychotic Disorders." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.
[80] AR, pp. 14, 19 (*citing* AR, pp. 488-495).

of Plaintiff's ear condition on April 18, 2013 and concluded that "the impairment causes no more than minimal functional limitations and does not significantly limit the performance of basic work related activities."[81]  The Audiological Evaluations from 2010 through 2013 also support the ALJ's credibility determination.  According to the Audiological Evaluations, Plaintiff's hearing loss in the right ear was described as "moderate" or "moderate to severe" from 2010 through 2012.[82]  Although Plaintiff's hearing loss was described in the Audiological Evaluations as "moderately-severe to severe" in January and March of 2013 and "severe" in August 2013, Plaintiff maintained 100% speech discrimination in both ears during that time.[83]  Thus, the medical evidence supports the ALJ's determination regarding Plaintiff's credibility.

The Court also finds that the ALJ did not err in failing to include any limitations in the RFC specifically related to Plaintiff's ongoing treatment for his ear condition.  The Fifth Circuit has held that, "if an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity."  *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir. 2000); *See Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980) (finding that because the claimant's treatment program would significantly interrupt a normal, eight-hour workday, it was incumbent upon the ALJ to determine whether his need for frequent daily traction precluded him from engaging in gainful activity).  Although the claimant in *Newton* did not require daily treatment like the claimant in *Epps*, the *Newton* court found that the claimant visited the doctor, the hospital, and the emergency room frequently during the period in question and that her illness and its treatment occasionally caused her to sleep for several hours during the day.  *Newton*, 209

---

[81] AR, pp. 74-75.
[82] AR, pp. 567, 582, 584, 590.
[83] AR, pp. 543, 553, 559.

F.3d at 459.  On remand, the court ordered the ALJ to consider the effect of ongoing treatment on

the claimant's ability to remain gainfully employed during the period of claimed disability.  *Id.*  In

*Francois v. Comm'r of Soc. Sec.*, the court similarly held that, "it was incumbent on the ALJ to

consider Francois [sic] pain and drug therapy as a possible factors [sic] limiting the type of work

she could perform."  158 F. Supp. 2d 748, 771 (E.D. La. 2001).[84]

     Here, Plaintiff has not shown that the ongoing treatment for his ear condition "significantly

interrupts the ability to perform a normal, eight-hour work day."  *See Newton*, 209 F.3d at 459.

Plaintiff asserts that his ear treatment requires the use of ear drops twice a day and ointment twice

a week, followed by the use of a hairdryer.[85]  Plaintiff claims that in 2011 and 2012, he was

required to use an ear wash twice a day, along with daily hairdryer treatment.[86]  Plaintiff also

asserts that in 2013, he was required to use an ear wash followed by a hair dryer two to four times

a day.[87]

     What Plaintiff fails to mention is that he was only required to use the ear washes four times

a day for one month, between his February 13, 2013 visit with Dr. Arriaga and his follow-up visit

on March 20, 2013.[88]  When Plaintiff returned for his follow-up visit on March 20, 2013, Dr.

Arriaga decided to shift Plaintiff from wet treatment to dry treatment, recommending that Plaintiff

use a hairdryer twice a day, antibiotic powder twice a week, and that he stop the ear washes.[89]

When Plaintiff returned to Dr. Arriaga for a follow-up visit on May 1, 2013, Dr. Arriaga found

that, "The dry treatment really seems to have done the trick" and decided to decrease the frequency

---

[84] The claimant in Francois had testified that she suffered from drowsiness, blurred vision, nausea, etc., all of which may or may not have been attributable to her drug therapy.  *Francois*, 158 F. Supp. 2d at 771.
[85] R. Doc. 17 at 7 (*citing* AR, p. 371).
[86] R. Doc. 17 at 7 (*citing* AR, pp. 384, 392).
[87] R. Doc. 17 at 7.  Plaintiff cites a February 13, 2013 treatment note from Dr. Arriaga that states, "vinegar washes 4 times a day followed by the hair dryer."  (AR, p. 490).
[88] AR, pp. 488-91.
[89] AR, p. 549-51.

of the powder to once a day per month, then every other day per month, then two times a week.[90]

When Plaintiff returned for another follow-up visit on August 7, 2013, Dr. Arriaga recommended

that Plaintiff go back to using two puffs of the ear powder daily for two weeks, then one puff daily

for two weeks, and then one puff every other day and the hair dryer twice a day.[91]  Thereafter,

during a follow-up visit on November 6, 2013, Dr. Arriaga recommended that Plaintiff continue

using the powder twice a week "and we will plan a recheck at the 4-month point with an

audiogram."[92]  No further treatment notes from Dr. Arriaga are provided.

After reviewing the medical records, the Court finds that the ongoing treatment required

for Plaintiff's ear condition does not significantly interrupt his ability to perform a normal, eight-

hour work day such that the ALJ was required to determine whether the effect of the treatment

precludes Plaintiff from engaging in gainful activity.  *See Newton v. Apfel,* 209 F.3d 448, 459 (5th

Cir. 2000).  The Court also finds that the ALJ did not commit reversible error by not including any

specific limitations in the RFC determination related to Plaintiff's ongoing treatment for his ear

condition.

### D.  Substantial evidence supports the ALJ's decision regarding the weight given to Dr. Morrison's November 26, 2013 Medical Source Statement.

In his second assignment of error, Plaintiff asserts that the ALJ erred by failing to give the

proper weight to the opinion of his treating physician, Dr. Francine Morrison, regarding his mental

status.[93]  While the Court agrees that generally, a treating physician's opinion should be accorded

great weight, we find that the ALJ's decision to afford "little weight" to Dr. Morrison's Medical

---

[90] AR, 545.
[91] AR, p. 540.
[92] AR, p. 535.
[93] R. Doc. 17 at 9-17.

Source Statement is supported by substantial evidence and, therefore, is not a ground for reversal or remand.[94]

Generally, the "opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also* 20 C.F.R. § 404.1527(c)(1) (examining physician opinion given more weight than non-examining physician). However, the ALJ may reject the treating source's opinion when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (quoting *Newton*, 209 F.3d at 458). "[T]he ALJ may give 'less weight, little weight, or even no weight' to the opinion of a treating physician upon a showing of good cause." *Ray v. Barnhart*, 163 F. App'x 308, 313 (5th Cir. 2006) (quoting *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)).

The *Newton* court held that before an ALJ declines to give any weight to the opinions of the claimant's treating specialist, the ALJ must consider: (1) the physician's length of treatment; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) consistency of the opinion with the record as a whole; and (6) the physician's specialization. 209 F.3d at 456. However, if the ALJ's decision is supported by substantial, competing, first-hand

---

[94] Under the regulations, a "treating source" is defined as a medical source that has or has had "an ongoing treatment relationship" such that the medical evidence shows that Plaintiff sees or has seen "the source with a frequency consistent with accepted medical practice for the type of treatment." 20 C.F.R. § 404.1502. Opinions from treating sources are generally given more weight "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Where no such longitudinal pattern of care is shown, the Fifth Circuit has held that an ALJ is not required to give that professional's opinion greater weight. *See Clayborne v. Astrue*, 260 F. App'x 735, 737 (5th Cir. 2008) (doctor properly rejected as treating source where "isolated visits" did not amount to an "ongoing treatment relationship" with doctor); *Taylor v. Astrue*, 245 F. App'x 387, 391 (5th Cir. 2007) ("Taylor's two visits to Dr. Weisberg, four years apart, are the sort of 'individual examinations' that are *distinguished* . . . from the continuous care provided by a treating physician."); *Hernandez v. Heckler*, 704 F.2d 857, 860–61 (5th Cir. 1983) (doctor who only saw claimant twice in a 17-month period was not a treating physician).

medical evidence from another physician, the ALJ is not required to go through the *Newton* analysis. *Cain v. Barnhart*, 193 F. App'x 357, 360 (5th Cir. 2006) (citing *Newton*, 209 F.3d at 458; *Walker*, 158 F. App'x 534). The Fifth Circuit has held, "The ALJ is responsible for resolving conflicts in the evidence, and we will not substitute our judgment for his." *Cain*, 193 F. App'x at 361. Thus, an ALJ is free to discredit the opinion of a treating physician when it is contradicted by the evidence in the record. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987). This Court has similarly affirmed an ALJ's rejection of a treating physician's opinion that was inconsistent with the physician's own treatment records and other evidence in the record. *See Villar v. Colvin*, 2015 WL 7731400 (M.D. La. Oct. 9, 2015).

The record shows that Plaintiff was hospitalized at Bogalusa Medical Center on January 9, 2010 with a diagnosis of "psychosis, not otherwise specified."[95] Plaintiff was discharged on January 26, 2010, with a diagnosis of "schizophrenia, undifferentiated type" and "otitis media, resolved after course of Augmentin therapy."[96] Plaintiff subsequently sought treatment at Margaret Dumas Mental Health Center from January 2010 through October 2011.[97] The record supports the ALJ's finding that most of the medical records from January 2010 through October 2011 indicate that Plaintiff was "doing well with medications,[98] with only a few entries indicating depression, constant sleeping and lack of motivation, and no interest in referral to a day program or part-time work."[99]

The record also supports the ALJ's finding regarding significant gaps in Plaintiff's history of treatment, as there is no record evidence of treatment between October 2011 and April 2012.

---

[95] AR, p. 257-58.
[96] AR, p. 259.
[97] AR, pp. 272-307.
[98] AR, pp. 272, 274-75, 277, 280, 283-86, 288, 290.
[99] AR, p. 20 (*citing* pp. 273, 281-82, 285).

On April 30, 2012, Plaintiff was evaluated by Dr. Morrison at Capital Area Human Services and reported that he was hallucinating, walking at night, and talking to himself.[100]  Dr. Morrison conducted a "Mental Status Exam" and found that Plaintiff's hygiene/appearance and eye contact were good, his alertness was normal, his "motor" function was marked as "abnormal movements," his mood was euthymic, his attitude was cooperative, he presented no risk of harm, and his thought content was non-psychotic and not paranoid.[101]  Dr. Morrison assessed Plaintiff with a Global Assessment of Functioning ("GAF") score of 55,[102] which indicates "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning."[103]  Although Dr. Morrison continued to write prescriptions for Plaintiff in May, July, and October 2012 and in January 2013,[104] there is no evidence in the record to show that Dr. Morrison actually examined Plaintiff during that time.  On April 29, 2013, Plaintiff returned to Capital Area Human Services and reported that he was hallucinating, walking at night, eating constantly, talking to himself, and fidgeting.[105]  However, the medical records show that Plaintiff was assessed by a Licensed Clinical Social Worker during the April 29, 2013 visit, not a physician.[106]

On August 5, 2013, Plaintiff was re-evaluated by Dr. Morrison, who found that Plaintiff had improved while taking the medication Saphris, but he was "still irritable."[107]  Dr. Morrison noted that Plaintiff denied any side effects from taking Lexapro and Plaintiff's mother reported that he was better while taking the medication.[108]  Plaintiff was assessed a GAF score of 65, which

---

[100] AR, pp. 528-29.
[101] AR, p. 529.
[102] GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001) (*quoting* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders,* at 32 (4th ed. 1994) (DSM–IV)).
[103] AR, 529.
[104] AR, pp. 269-70.
[105] AR, pp. 519-27.
[106] AR, pp. 522, 525.
[107] AR, pp. 517-18.
[108] AR, p. 518.

"indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but . . . generally functioning pretty well."[109]   Dr. Morrison conducted another "Mental Status Exam" and found that Plaintiff's hygiene/appearance and eye contact were good, his alertness and motor skills were normal, he was irritable but cooperative, he presented no risk of harm, and his thought content was non-psychotic.[110]   The prescription log shows that on August 5, 2013, Dr. Morrison increased Plaintiff's dosage of Saphris from 5 mg to 10 mg, but neither the log nor the August 5, 2013 treatment note state why the medication was increased.[111]

Although the prescription log contains an entry on November 4, 2013 for three prescription refills for Plaintiff, there is no record evidence of treatment by Dr. Morrison between August 5, 2013 and November 26, 2013, the date of her Medical Source Statement.[112]   The Medical Source Statement provides that Dr. Morrison has treated Plaintiff since his admission to Margaret Dumas Mental Health Center on April 25, 2012, and that Plaintiff has a diagnosis of paranoid schizophrenia.[113]   Dr. Morrison reports that Plaintiff has not been mentally stable since his admission and that he has had difficulty with the medications and with non-compliance with the medications due to their alleged side effects.[114]   Dr. Morrison found that Plaintiff's symptoms include poor hygiene and grooming (unless prompted by his mother), pacing at night, irritability with yelling at others, sleeplessness, paranoid ideation, mumbling at times, but usually with a soft, low, coherent speech that is goal directed.[115]   Dr. Morrison also found that Plaintiff has a depressed mood, poor judgment, and poor insight into his mental disorder and that his current medications

---

[109] *Lambert v. Astrue*, 2012 WL 2254313, at *2 (W.D. La. June 14, 2012) (*citing* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 34 (4th ed. text. rev. 2000) (DSM-IV-TR)).
[110] AR, p. 518.
[111] AR, p. 516.
[112] AR, pp. 517-18, 531-32.
[113] AR, p. 532.
[114] *Id*.
[115] *Id*.

include Saphris, Buproprion, and Cogentin.[116]  Dr. Morrison noted that on August 5, 2013, Plaintiff's prescription for Saphris "had to be increased due to [Plaintiff's] increasing pathology which was demonstrated by increased auditory hallucinations, increased insomnia, increased paranoid ideation, increased irritability and depression."[117]

Although there is no evidence in the record showing that Dr. Morrison actually examined Plaintiff in connection with completing the November 26, 2013 Medical Source Statement, the Medical Source Statement provides that, "The Lexapro was changed to Buproprion on 11/04/13, due to his depression not responding well to Lexapro."[118]  The Medical Source Statement further states that Plaintiff's condition improved with the increase in Saphris, but he remains irritable, has auditory hallucinations, is still paranoid (but has had a decrease in this symptom), and he is more compliant with the new medications than before due to a reduction in the side effects.[119]  Dr. Morrison also found that Plaintiff "continues to have little understanding of his mental disorder and does not believe he needs medication in order to maintain his current minimal level of functioning and control of his temper."[120]  Dr. Morrison ultimately concluded that Plaintiff would be a hazard in a work environment due to his irritability and his paranoid ideation.[121]

Although the ALJ does not refer to Dr. Morrison as Plaintiff's "treating physician," the ALJ appears to treat her as one by specifying the weight given to Dr. Morrison's November 26, 2013 Medical Source Statement.[122]  The ALJ gave Dr. Morrison's Medical Source Statement little weight based on the lack of follow-up treatment provided in 2012[123] and the fact that Dr. Morrison

---

[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] AR, p. 20.
[123] *Id.*

only saw Plaintiff three times in 2013[124] and found that Plaintiff's condition improved on the medication Saphris.[125]   The Court finds it unnecessary to determine whether Dr. Morrison is a "treating physician" because Dr. Morrison's November 26, 2013 Medical Source Statement is inconsistent with her treatment records and would not be entitled to substantial weight even if Dr. Morrison is a "treating physician."   The Fifth Circuit has held that an ALJ may give less weight to a treating physician's opinion when good cause is shown, as is the case when his statement as to disability is so brief and conclusory that it lacks strong persuasive weight, is not supported by medically acceptable clinical laboratory diagnostic techniques, *or is otherwise unsupported by the evidence*.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (emphasis added).

Here, Dr. Morrison examined Plaintiff on April 30, 2012 and again on August 5, 2013 and the "Mental Status Exam" results from the two visits are nearly identical.[126]   During both visits, Dr. Morrison found Plaintiff's hygiene/appearance was good, his speech was within normal limits, his thought process was logical, unremarkable and *non-psychotic*, and his "Risk of Harm" was "none."[127]   Dr. Morrison did not find Plaintiff's thought process was "paranoid" during either exam.[128]   The only difference between the two "Mental Status Exam" results is that Dr. Morrison found Plaintiff's movements were abnormal in 2012 and normal in 2013 and Plaintiff's mood was euthymic in 2012 and irritable in 2013.[129]   Further, in April 2012, Dr. Morrison assessed Plaintiff with a GAF score of 55, which indicates "moderate symptoms" or "moderate difficulty in social,

---

[124] Although the ALJ found that Dr. Morrison treated Plaintiff three times in 2013, the medical evidence of record shows that Dr. Morrison only examined Plaintiff once in 2013, on August 5, 2013.  (AR, pp. 517-18).

[125] AR, p. 20.

[126] AR, pp. 517-18, 528-29.   The results of Dr. Morrison's exams are also similar the results of the Mental Status Examination performed by Ashely Barton, LCSW, on April 29, 2013.  (AR, pp. 519-22) (finding Plaintiff's general appearance was "healthy," his speech was "slow," his thought process was "evasive," and Plaintiff denied that he presented a risk of harm to others).

[127] AR, pp. 518, 529 (emphasis added).

[128] *Id*.

[129] *Id*.

occupational, or school functioning."[130]  In August 2013, however, Dr. Morrison assessed Plaintiff

with a GAF score of 65, which "indicates some mild symptoms or some difficulty in social,

occupational, or school functioning, but . . . generally functioning pretty well."  *Lambert v. Astrue*,

2012 WL 2254313, at *2 (W.D. La. June 14, 2012) (*citing* American Psychiatric Ass'n, Diagnostic

and Statistical Manual of Mental Disorders, at 34 (4th ed. text. rev. 2000) (DSM-IV-TR)).

The Court finds that Dr. Morrison's contemporaneous clinical findings directly contradict

the opinion in her November 26, 2013 Medical Source Statement that Plaintiff's symptoms include

"poor hygiene and grooming . . . paranoid ideation, mumbling at times, usually with a soft, low,

coherent speech" and "a depressed mood, poor judgment . . . ."[131]  The Court agrees with the

Commissioner that Dr. Morrison's clinical assessments show that Plaintiff had moderate to mild

symptoms and that Dr. Morrison concluded that Plaintiff did not pose a risk of harm to himself or

others.[132]  The results of Dr. Morrison's "Mental Status Exams" also show that in April 2012 and

in August 2013, Plaintiff's "thought content" was found to be "non-psychotic" and not

"paranoid."[133]  These findings directly contradict Dr. Morrison's November 26, 2013 Medical

Source Statement, in which she concluded that, "In a work environment [Plaintiff] would be a

*hazard* due to his irritability and his *paranoid* ideation."[134]  As such, the Court finds that substantial

evidence supports the ALJ's decision to give little weight to Dr. Morrison's November 26, 2013

Medical Source Statement because her conclusions are inconsistent with and contradict her own

contemporaneous clinical findings.

---

[130] AR, 529.
[131] AR, p. 532.
[132] As the Court previously pointed out, there is no evidence in the record that Dr. Morrison examined Plaintiff in connection with completing her November 26, 2013 Medical Source Statement.  The record only shows that Dr. Morrison examined Plaintiff on April 30, 2012 (AR, pp. 528-29) and again on August 5, 2013 (AR, pp. 517-18).
[133] AR, p. 518, 529.
[134] AR, p. 532 (emphasis added).

Plaintiff further asserts that the ALJ erred in not considering the medical opinion of Dr. Chaillie Daniel, another alleged treating physician, when determining whether Dr. Morrison's opinions were entitled to controlling weight.[135]   On September 21, 2010, Dr. Daniel provided a medical statement that provides, "Mr. Swan has been a patient at the Daniel Clinic since 2005.  He suffers from mental illness and schizophrenia.  He is unable to perform job duties."[136]   The Court finds that the ALJ did not err by not considering Dr. Daniel's opinion in determining whether Plaintiff was disabled.  "[S]ome opinions by physicians are not medical opinions, and as such have no 'special significance' in the ALJ's determination."  *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (*quoting* 20 C.F.R. § 404.1527(e) & (e)(3)).  "Among the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'  These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'"  *Frank*, 326 F.3d at 620 (*quoting* 20 C.F.R. § 404.1527(e)(1)).  The Court finds Dr. Daniel's opinion that Plaintiff is "unable to perform job duties" is similar to an opinion that Plaintiff is "unable to work."  Thus, Dr. Daniel's opinion was a legal conclusion and the ALJ was not required to give it any special significance.

Plaintiff also argues that the ALJ erred by failing to consider whether Dr. Morrison's opinions were supported by those of Dr. James Van Hook, Plaintiff's examining psychologist.[137]  Plaintiff asserts that both Dr. Van Hook and Dr. Morrison found that Plaintiff could not consistently respond appropriately to supervision or co-workers.[138]  While Plaintiff acknowledges that the ALJ reviewed Dr. Van Hook's medical opinions, Plaintiff argues there is no indication

---

[135] R. Doc. 17 at 9-11.
[136] AR, p. 434.
[137] R. Doc. 17 at 11- 12.  On April 9, 2013, Dr. Van Hook conducted a Mental Status Exam of Plaintiff at the request of the State agency.  (AR, pp. 18, 498-500).
[138] R. Doc. 17 at 11-12 (*citing* AR, pp. 500, 532).

that the ALJ considered that Dr. Van Hook's opinions were consistent with and supported Dr.

Morrison's opinions. However, Dr. Van Hook's April 9, 2013 Mental Status Examination shows

that the results of Plaintiff's "Symptom Distortion/Magnification" exam "were felt to be an

unreliable estimate of his cognitive functioning and a guarded appraisal of his current level of

socioemotional/behavioral distress."[139]   Dr. Van Hook also found that Plaintiff's short-term

memory was weak and his performance was marginal, "but his level of effort was judged to be not

adequate."[140]   Dr. Van Hook similarly observed Plaintiff's persistence to be poor and that "He

answered all questions but showed less than adequate effort."[141]   In his "Psychological Source

Statement," Dr. Van Hook found that Plaintiff "was cooperative but showing probable suboptimal

effort."[142]  Dr. Van Hook also found that Plaintiff's "ability to sustain effort and persist at a normal

pace over the course of a routine 40-hour workweek is perhaps mildly impaired from a

psychological perspective by his psychosis and depression."[143]

     The Court finds that the ALJ did not commit reversible error by failing to consider whether

Dr. Morrison's opinions were supported by those of Dr. Van Hook.  The Court has concluded that

the ALJ did not err in giving little weight to Dr. Morrison's November 26, 2013 Medical Source

Statement because it is inconsistent with her contemporaneous clinical findings.  That conclusion

is not affected by whether Dr. Morrison's Medical Source Statement is supported by Dr. Van

Hook's medical opinions.  The Court further finds that Dr. Van Hook's medical opinions do not

support the findings in Dr. Morrison's Medical Source Statement that, "In a work environment,

[Plaintiff] would be a hazard due to his irritability and his paranoid ideation"[144] because Dr. Van

---

[139] AR, p. 499.
[140] Id.
[141] Id.
[142] AR, p. 500.
[143] Id.
[144] AR, p. 532.

Hook's measurements may have been skewed by Plaintiff's lack of effort and, even so, Dr. Van Hook found Plaintiff's ability to work a 40-hour workweek was only "mildly impaired" by his psychological condition.  As such, the ALJ did not err by not considering Dr. Van Hook's opinions when determining the weight of Dr. Morrison's November 26, 2013 Medical Source Statement.

### E.  Substantial evidence supports the ALJ's RFC determination at step four.

In his third assignment of error, Plaintiff claims the ALJ erred in her RFC determination by failing to find that Plaintiff was limited in his ability to interact appropriately with supervisors and co-workers, as well as the general public.[145]  Plaintiff argues that the ALJ rejected the opinions of Dr. Morrison, Dr. Daniel, and Dr. Van Hook that Plaintiff's ability to "respond appropriately to supervision and interact appropriately with others was guarded," that Plaintiff "would be a hazard due to his irritability and his paranoid ideation" in a work place, and that Plaintiff would likely have difficulty in maintaining control of his temper.[146]  Plaintiff claims the ALJ rejected the opinions of all of the psychological and medical experts who offered opinions on his mental functioning and impermissibly relied on her own lay opinions when determining Plaintiff's RFC.[147]

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ's RFC decision can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that supports his or her decision or all the evidence that he or she rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion

---

[145] R. Doc. 17 at 17-18.
[146] *Id*. at 18 (*citing* AR, pp. 434, 500, 532).
[147] R. Doc. 17 at 18-19.

based on the evidence in the record. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The court "may only scrutinize the record" and take into account whatever fairly detracts from the substantiality of the evidence supporting the ALJ's decision. *Leggett*, 67 F.3d at 564. Accordingly, a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision. *Johnson*, 864 F.2d at 343-44.

The Court finds that the ALJ's RFC determination is supported by substantial evidence. As previously discussed, the ALJ found that the medical evidence of record, specifically the treatment notes from Dr. Morrison, shows Plaintiff responded well to medication and that his condition improved while taking Saphris.[148] The ALJ specifically found that, "The state agency mental health consultant had insufficient evidence of [sic] evaluate the claim due to failure of the claimant to [sic] suboptimal effort during the psychological consultative examination."[149] The "state agency mental health consultant" was Dr. William Berzman, who evaluated Plaintiff on April 17, 2013 and concluded that the exam results were "an unreliable estimate of [Plaintiff's] cognitive functioning. His level of effort was not considered adequate and he probably was showing suboptimal effort during the examination. There is insufficient evidence to base a decision recommendation due to [Plaintiff's] failure to cooperate during the assessment process."[150] Dr. Berzman further concluded, "There is insufficient evidence to substantiate the presence of a disorder."[151] Substantial evidence, therefore, supports the ALJ's RFC determination

---

[148] AR, pp. 19, 20; *See* AR, pp. 517-18, 528-29.
[149] AR, p. 20.
[150] AR, pp. 67, 75.
[151] *Id*.

that Plaintiff can perform a full range of work at all exertional levels, but with the nonexertional limitation of being limited to work of a simple, routine nature with no public interaction.[152]

The Court further finds that Plaintiff's arguments on this issue lack merit.  The Court has concluded that the ALJ did not err in giving little weight to Dr. Morrison's medical opinion that, "In a work environment [Plaintiff] would be a hazard due to his irritability and his paranoid ideation"[153] because it is inconsistent with Dr. Morrison's contemporaneous clinical findings that Plaintiff had "non-psychotic" thoughts and was not paranoid.[154]  Although Dr. Van Hook found that Plaintiff's "ability to respond appropriately to supervision and interact appropriately with others was guarded," Dr. Van Hook noted that Plaintiff "was cooperative but showing probable suboptimal effort."[155]  The Court finds no error in the weight given by the ALJ to Dr. Van Hook's opinion.  "The administrative fact finder is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly."  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985) (citation omitted).

Finally, Dr. Daniel's medical statement did not address Plaintiff's ability to interact with coworkers or supervisors, as Dr. Daniel merely concluded that, "[Plaintiff] suffers from mental illness and schizophrenia.  He is unable to perform job duties."[156]  The Court has concluded that Dr. Daniel's medical statement is not a medical opinion, but rather a legal conclusion that is not entitled to any special significance.  *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (*citing* 20 C.F.R. § 404.1527(e)(1)).  Thus, the Court finds that the ALJ did not err by not considering Dr. Daniel's opinion in determining Plaintiff's RFC.

---

[152] AR, pp. 15-16.
[153] AR, p. 532.
[154] AR, pp. 518, 529.
[155] AR, p. 500.
[156] AR, p. 434.

**F.  The ALJ did not err by relying upon vocational expert testimony.**

In his fourth assignment of error, Plaintiff asserts that the ALJ erred in relying upon the testimony of a vocational expert to find a significant number of jobs existed in the national economy for someone with Plaintiff's age, education, work experience, and RFC.[157]  Plaintiff's entire argument on this issue is contained in one sentence, which states that, "Because the ALJ relied on testimony elicited by a defective hypothetical question, the ALJ did not carry his burden to show that despite Plaintiff's impairments, Plaintiff could perform available work.   See discussion, *supra*, and *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001)."[158]  In *Bowling v. Shalala*, the Fifth Circuit articulated the test for determining when a defective hypothetical question to a vocational expert will produce reversible error:

> Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand.

36 F.3d 431, 436 (5th Cir. 1994).

During the December 3, 2013 administrative hearing, the ALJ posed the following hypothetical question to the vocational expert: "[P]lease assume a hypothetical person the same age, education, vocational history as the claimant.  Further assume that he could work at all levels of exertion, but of [sic] simple, routine nature, with no public contact or no public interaction."[159]  When the ALJ asked the vocational expert if Plaintiff would be able to return to any of his past

---

[157] R. Doc. 17 at 20-21.
[158] *Id*. at 21.
[159] AR, p. 45.

relevant work, the vocational expert replied, "No."[160]  The ALJ then asked the vocational expert

if there would be other jobs available to Plaintiff and the vocational expert responded with the

following:

> Well, I think so.  Things that are – dishwasher, no public contact.
> Or no public interaction, let's put it that way; it is pretty isolative.
> This is DOT number 318.687-010; it's medium with an SVP of 2,
> so it's simple, it's routine.  We show these fall under SOC Code 35-
> 9021, dishwashers.  We show 510,200 in the national economy,
> 5,680 in Louisiana.   Commercial or institutional cleaner, DOT
> number 381.687-014; it's considered heavy, SVP is at 2.  Basically
> there is no public interaction in that job.  We show these fall under
> SOC Code 37-2011.  We show 2,310,400 in the national economy,
> 29,130 in Louisiana.  Grounds keeper/helper, DOT 408.687-014; it
> is heavy, with an SVP of 2.  We show these fall under SOC Code
> 37-3011.  We show 1,151,500 in the national economy, 9,910 in
> Louisiana.  And I think that is a representative sampling.  There
> certainly would be others with that particular hypothetical.[161]

The ALJ's hypothetical question is consistent with the ALJ's RFC determination.

In accordance with *Bowling*, Plaintiff's counsel was "afforded the opportunity to correct

deficiencies in the ALJ's question" during cross examination of the vocational expert.[162]

Plaintiff's counsel asked the following question: "Let's assume, adding to the judge's – building

on the judge's hypothec [phonetic], that this individual is unable to interact with the public or co-

workers or supervisors on a useful and consistent basis – stopping right there for now.  Would that

change your response?"[163]   The vocational expert responded, "Yes, sir, it would" and further

explained that, "I think if there is no useful ability to interact with co-workers or supervisors,

especially the latter, I think you are pretty much left with nothing."[164]  Although the ALJ's decision

does not mention the hypothetical question posed by Plaintiff's counsel, the Court has found that

---

[160] *Id*.
[161] AR, pp. 45-46.
[162] AR, p. 46.
[163] *Id*.
[164] *Id*.

the ALJ's RFC determination, without the additional limitations proposed by Plaintiff's counsel, is supported by substantial evidence.  Thus, Plaintiff's allegation of error is without merit.

### G.  Substantial evidence supports the ALJ's credibility determination.

In his fifth assignment of error, Plaintiff claims the ALJ erred in finding Plaintiff not credible.[165]  Plaintiff argues that the ALJ's decision is vague and unclear because the ALJ: (1) substitutes a general summary of the evidence as her reasons for rejecting Plaintiff's complaints; (2) fails to address the seven factors required by SSRs 96-7p and 03-2p; and (3) makes findings not supported by substantial evidence.[166]

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his or her treating or examining sources concerning the alleged symptoms and their effects.  20 C.F.R. § 404.1529(c)(1).  Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider.  See 20 C.F.R. § 404.1529(c) (2011).[167]  The Fifth Circuit has held that the ALJ is not required to follow "formalistic rules" in assessing credibility, and the ALJ must articulate his or her reasons for rejecting a

---

[165] R. Doc. 17 at 21-25.

[166] *Id*. at 21.

[167] These factors include:

> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

Ultimately, "The mere existence of pain does not automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence." *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citation omitted). Likewise, an individual's statements regarding pain and other symptoms alone are not conclusive evidence of disability and must be supported by objective evidence of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* (*quoting* 42 U.S.C. § 423(d)(5)(A)).

Here, the ALJ began her credibility assessment by acknowledging that Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms."[168] Nonetheless, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[169] Before making this determination, the ALJ considered Plaintiff's testimony from the December 2013 administrative hearing regarding his daily activities. At the hearing, Plaintiff testified that he lives with his parents and two sisters and has a bachelor's degree in criminal justice.[170] Plaintiff testified that he was diagnosed with schizophrenia in January 2010 and was hospitalized.[171] Plaintiff explained that he has visual hallucinations of people and animals at night, but has no other symptoms and was prescribed medication and receives counseling.[172] Plaintiff further testified that his mother cooks, cleans, does the laundry, and shops and he

---

[168] AR, p. 17.
[169] *Id.*
[170] AR, p. 32.
[171] AR, p. 33.
[172] AR, pp. 33-34.

sometimes washes dishes and sweeps the floors.[173]  Plaintiff testified that he spends his time watching television and on the internet and that he has about 300 friends on Facebook.[174]  Plaintiff also testified that he attends church once or twice a month, he goes to the store with his mother but sits in the car, he seldom does yard work, and he has a driver's license but does not drive.[175]

During cross-examination by his attorney, Plaintiff testified he has no friends, he does not go out and do anything with friends, and he has no hobbies.[176]  Plaintiff testified that he stopped going to church for about six months, but had started going again in February 2010.[177]  Plaintiff further testified that he could sometimes follow two-step instructions,[178] he does not bathe or dress himself regularly,[179] he talks to himself sometimes when he gets bored,[180] he laughs to himself if he thinks someone is funny,[181] and he hallucinates about twice a month.[182]  Plaintiff testified that his depressive moods go up and down and on a "down day" he lies in bed all day, isolates himself from other people, does not bathe or dress himself, and he feels "down."[183]  Plaintiff testified that he paces at night less than once a week, but more than once a month, and that his prescription medication (Saphris) was increased in August 2013 due to increased hallucinations.[184]  Plaintiff further testified that he goes out to eat with his family, watches television, but sometimes has difficulty following the storylines, and reads the newspaper without problems.[185]

---

[173] AR, p. 32, 35.
[174] AR, p. 35.
[175] AR, pp. 35-37.
[176] AR, p. 37.
[177] AR, pp. 37-38.
[178] AR, pp. 38-39.
[179] AR, p. 39.
[180] *Id*.
[181] *Id*.
[182] *Id*.
[183] AR, p. 40.
[184] AR, p. 41.
[185] AR, p. 42.

The ALJ then considered Plaintiff's medical records and found that they contradicted Plaintiff's allegations regarding his mental condition because the records revealed "relatively infrequent trips to the doctor for the allegedly disabling symptoms."[186]  The ALJ also found that the medical records show Plaintiff "was doing well with medications" in 2010 and 2011 and that he "improved on Saphris" in 2013.[187]  Thus, the ALJ found that "the medical records reveal that the medications have been relatively effective in controlling [Plaintiff's] symptoms."[188]  As previously discussed, these determinations are supported by the medical evidence contained in the record.[189]  The medical records also show that Plaintiff did not receive treatment between October 2011 and April 2012, when he was examined by Dr. Morrison on April 30, 2012.[190]  Thereafter, Plaintiff was not examined again until he saw Dr. Morrison on August 5, 2013.[191]  During her August 5, 2013 evaluation, Dr. Morrison found that Plaintiff "has improved on the Saphris," but noted that Plaintiff "is still irritable."[192]  As such, the Court finds the ALJ's credibility determination is supported by substantial evidence.

With respect to Plaintiff's ear condition, the ALJ "[did] not find the [Plaintiff's] statements regarding the severity of his impairment or the degree of his limitations fully credible."[193]  Although the medical evidence shows Plaintiff has a history of right ear problems and was "status post-surgery," the ALJ found that, "At the hearing, [Plaintiff] was able to hear and understand normal conversation, he made no mention of a hearing problem, and medical records post-surgery indicate he is doing well."[194]  The Court finds substantial evidence supports the ALJ's

---

[186] AR, p. 17.
[187] AR, pp. 19-20.
[188] AR, p. 20.
[189] AR, pp. 517-18, 528-29.
[190] AR, pp. 528-29.
[191] AR, pp. 517-18.
[192] AR, p. 518.
[193] AR, p. 19.
[194] *Id.*

determination, as the transcript from the December 3, 2013 administrative hearing shows that Plaintiff and his counsel only alleged that Plaintiff was disabled due to his schizophrenia.  When the ALJ asked Plaintiff, "What's wrong with you?" Plaintiff responded, "I have schizophrenia."[195] Similarly, during his closing statement, Plaintiff's counsel stated, "[W]e are arguing that [Plaintiff] meets [Listing] 12.03A," which covers "Schizophrenic, Paranoid, and Other Psychotic Disorders."[196]  Neither Plaintiff nor his counsel mentioned anything about Plaintiff's ear condition or Plaintiff's alleged hearing loss.  Further, the Court has concluded that the ALJ did not err in determining that Plaintiff's ear condition does not constitute a severe impairment.  The Court, therefore, finds that the ALJ's determination regarding Plaintiff's credibility is supported by substantial evidence.

## VI.  Conclusion

The analysis above demonstrates that Plaintiff's claims of reversible error are without merit.  The record considered as a whole supports the finding that the ALJ applied the proper legal standards and substantial evidence supports the determination that Plaintiff is not disabled.

### RECOMMENDATION

It is the recommendation of the Magistrate Judge that under sentence four of 42 U.S.C. § 405(g), the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin, denying the applications for disability and supplemental security income benefits filed by plaintiff, Jason Patrick Swan, be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**.

Signed in Baton Rouge, Louisiana, on August 30, 2016.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[195] AR, p. 33.
[196] AR, pp. 46-47; *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.